IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JANUARY 25, 2008 Session

## RICKIE B. CLAYTON v. ROSIE B. CLAYTON

**Direct Appeal from the Chancery Court for Shelby County**
**No. 03-2039     Arnold B. Goldin, Chancellor**

_____

**No. W2007-01079-COA-R3-CV - Filed May 21, 2008**

_____

This appeal arises out of divorce proceedings. The parties were married for fourteen years and had two children. The trial court declared the parties divorced based on stipulated grounds; divided the marital estate; designated the mother primary residential parent and the father alternate residential parent; and ordered the father to pay the mother $200 per month in alimony in futuro. The father appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Terry R. Clayton, Nashville, TN, for Appellant

Patricia A. Woods, Memphis, TN, for Appellee

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

Rickie B. Clayton ("Father") and Rosie B. Clayton ("Mother") were married on April 2, 1993.  The parties have two daughters, who were born in 1994 and in 1996.  Father and Mother separated on March 14, 2003.  Father filed a complaint for divorce in October of 2003, alleging irreconcilable differences and inappropriate marital conduct.  Father's complaint alleged that Mother had falsely accused Father of sexually assaulting the parties' oldest daughter, who was eight years old at the time.  Father further alleged that Mother called the police and reported that Father raped their daughter, which constituted "cruel and unusual conduct."  Father also contended that Mother engaged in inappropriate marital conduct by refusing to work and pursuing a college degree for the past several years.  Father requested that the trial court equitably divide the parties' marital property and approve his proposed parenting plan, which named him primary residential parent and required Mother to pay child support.

Mother filed an answer and counter-complaint for divorce. Mother admitted that irreconcilable differences existed between the parties, but she denied that she engaged in inappropriate marital conduct.  She alleged that Father was guilty of inappropriate marital conduct, and that he was under a criminal indictment and charged with aggravated rape of a child.  Mother alleged Father was charged with raping the parties' daughter following a report by the daughter to her school.  Mother further alleged that Father had depleted marital assets and refused to support Mother and the children since the parties separated.  Mother contended that awarding custody to Father would not be in the children's best interest and asked that she be designated primary residential parent.  She asked that Father be limited to closely supervised visitation at a later date. Mother also sought alimony, child support, and the payment of her attorney's fees by Father.[1]

Father filed an answer to Mother's counter-complaint in which he claimed that Mother initiated the criminal charges against him by calling the police department.  Father generally denied the paragraph in Mother's counter-complaint requesting that she be designated primary residential parent and that Father have limited visitation.  Father's answer stated that he "would like to have some kind of visitation with his children."  Mother filed a proposed parenting plan, which named her as primary residential parent.  The plan further provided, in pertinent part:

---

[1] On December 2, 2003, a divorce referee held a hearing on Mother's motion for pendente lite child support, alimony, attorney's fees, and insurance coverage.  Neither Father nor his attorney attended the hearing.  The chancellor subsequently entered an order requiring Father to pay $526 per month in child support and $200 per month in alimony, provide automobile and health insurance for Mother and the children, and pay $250 toward Mother's attorney's fees. Father filed a motion for relief from the order, claiming that he and his attorney did not receive notice of the hearing. Father also filed an affidavit stating that he and Mother were in Chapter 13 bankruptcy proceedings, for which Father was subject to a payroll deduction to pay certain marital debts.  Following a hearing, the chancellor denied Father's motion upon finding that notice of the hearing on pendente lite support was mailed to Father's counsel in accordance with local rules.

The trial court subsequently found Father in contempt for failing to pay alimony, maintain insurance coverage, and pay $250 of Mother's attorney's fee. The court entered a judgment against Father for the unpaid costs in the amount of $2,525, and ordered the amounts to be withheld by income assignment thereafter.

Father is currently prohibited from having any contact with the minor children of the parties by orders of the Tennessee Department of Children's Services and the Criminal Court of Shelby County, Division 6. Upon resolution of the matter pending with the Department and in Criminal Court, father may Petition the Chancery Court to establish parenting time with the minor children of the parties.

On October 25, 2004, Father filed a "Motion for Visitation and for Inspection of Martial [sic] Residence." Father stated that he went to the marital residence, where Mother and the children lived, on October 16, 2004, and was denied entry. Father's motion stated that Mother had reported a claim to the parties' homeowner's insurance, resulting in a check being issued from the insurance company for $6,000. Father claimed that he should be allowed to inspect the residence because his name was the one listed on the deed and mortgage. He also contended there was no proof that an order existed from the Department of Human Services prohibiting him from visiting the children. Father claimed the criminal charges against him had been dismissed in August of 2004.

On February 1, 2005, Father's counsel, Mr. Terry Clayton, was permitted to withdraw as counsel for Father, and Mr. Michael Floyd was entered as Father's counsel of record. The parties subsequently attempted mediation, which proved unsuccessful.

A bench trial was held on January 25, 2007. Father's former attorney, Mr. Terry Clayton, appeared in court to the surprise of the chancellor and Mother's attorney. When the chancellor inquired about Mr. Clayton's presence, he said he intended to "serve as second chair" for Father. Mr. Clayton stated that he had filed a notice of appearance in the case three days before, but the chancellor stated that there was no such notice included in the case file, nor was it entered into the computer. Mother's attorney said she had not received any type of notice from Mr. Clayton. The chancellor informed Mr. Clayton that he could not "just show up" on the day of trial and participate, after an order had been entered allowing him to withdraw from the case. The chancellor pointed out that no motion had been filed or granted that would allow Mr. Clayton to assist in the trial. The chancellor then stated that because Mr. Clayton was not an attorney of record or a party, he could not participate in the trial. The chancellor told Mr. Clayton that he could remain in the courtroom as a visitor, but he could not speak with Mr. Floyd, Father's attorney, during the proceedings, nor could they pass notes during the trial. The trial then proceeded with only Mr. Floyd representing Father.

Mother's attorney pointed out that Father had not filed a proposed parenting plan prior to the day of trial, nor had he filed a pre-trial Rule 14 Memorandum.[2] Mother filed an amended, updated

---

[2] Rule 14 of the Rules of the Chancery Court for the Thirtieth Judicial District (Shelby County) provides, in part:

(b) If there is no property settlement or marital dissolution agreement, any party

(continued...)

pre-trial Rule 14 Memorandum eight days before trial. Father filed a proposed parenting plan on the day of trial, which designated Father the primary residential parent. Father's attorney stated that he had filed a Rule 14 Memorandum in 2005, and both parties stipulated that Father would be limited to using the 2005 memorandum.

Next, the chancellor referred to a motion in limine filed by Father to exclude certain documents from the record. Father's motion in limine is not in the record before us, and neither are the documents that were in dispute. According to the parties' briefs, the disputed documents were records from the Department of Children's Services ("DCS") and a child advocacy center, which were subpoenaed under seal to the court. Mother's pretrial memorandum stated that "[t]he records from the Child Advocacy Center and from DCS have been subpoenaed to be submitted to this honorable Court under seal, due to their extremely sensitive and confidential nature." Mother's attorney stated that a DCS representative would be arriving later in the day with the records related to DCS's investigation. Some type of records had already been received by the court, and the chancellor stated that the documents should have never been received. Mother's attorney stated that she did not intend to introduce them unless absolutely necessary. The chancellor stated that he would not consider the records from either agency, and they were never admitted into evidence. When Mother's attorney mentioned the criminal court proceedings, the chancellor interrupted her and said, "Wait a minute. I don't want to hear any of that. I don't want any of that interjected in the record." Mother's attorney agreed to limit her argument to the fact that Father had not made an effort to see the children in four years. The chancellor reiterated that he would base his decision solely on the evidence he deemed admissible. He stated that the "criminal allegations and all of that . . . is not in evidence and is not going to be in evidence, nor are whatever precipitated these issues going to be in evidence. So I don't need to hear any of that."

During opening statements, Mother's attorney stated that several issues were not disputed between the parties: the parties should be divorced based on stipulated grounds; Mother was to receive the marital residence; Mother would be awarded custody of the children, with Father paying "guideline child support;" and Mother was entitled to one-half of Father's retirement benefits. The chancellor asked Mother's attorney specific questions about the issues, and Father's attorney did not object to the characterization of these issues as undisputed. Mother's attorney stated that the only issues in dispute were (i) alimony; (ii) the allocation of marital debt; (iii) whether Father was entitled to visitation with the children, and if so, when it would begin; (iv) whether the parties owned any

_____

[2](...continued)
> seeking alimony or child support shall file a sworn statement, not less than thirty (30) days before the hearing date, setting forth the applicant's income, needs and expenses showing the purpose and amount and, if known, the income of the respondent. Not less than twenty (20) days before the hearing date, the Respondent shall file a like sworn statement showing income, needs and obligations.
> . . .
> (d) In contested divorces, where the division, description or value of marital assets is in dispute, at least fifteen (15) days before the hearing, the attorneys shall exchange their list of marital assets with a value placed on each asset; these lists of assets shall be filed with the Court at the time of exchange.

equity in the marital home; (v) when Mother must refinance the marital home; and (vi) attorney's fees. The parties then proceeded to testify about these issues.

Mother was fifty years old at the time of trial. When the parties married, Mother worked at a day care, then at Walgreen's for a short period of time. Mother returned to college, and she received a bachelor's decree in social work in August of 2003. After graduation, Mother began working for a children's home that provided social services, but the business closed down after a few months. Mother stated that with her degree, she could only make approximately seven dollars per hour unless she became a licensed social worker. However, Mother testified that she did not have "enough background" to obtain her license. Mother testified she had applied for numerous other jobs, listing some specifically, but she had not been hired. At the time of trial, Mother was substitute teaching on a regular basis for the Memphis City School system. She testified that she basically worked full-time, except during the summer breaks. Mother testified she was earning $85 per day substitute teaching, or roughly ten dollars per hour, and she earned between $11,000 and $13,000 the previous year. Mother's goal was to become a licensed teacher, but she had taken the required test once and failed. Mother testified she had not taken the test again because she could not afford the fee.

Husband testified he was fifty years old and in good health. He had worked at the Veteran's Administration Medical Center for fifteen years. In 2005, his gross income was $23,000, and in 2006, he earned $28,333. Father testified he was currently living with his mother and supporting her and "the family." Father stated that if he was awarded visitation with the children, he would need "ample time" to buy a home so that he could exercise his visitation rights. When Father's attorney asked Father about being awarded "partial custody" of the children, the chancellor asked him to clarify whether Father was seeking custody of the children as opposed to visitation. Father's attorney stated that Father was seeking "custody 120 days out of the year" as "the ARP," or alternate residential parent. He acknowledged that in Father's proposed parenting plan filed earlier that morning, Father was named primary residential parent. However, he stated that Father's alternative position was that Father be awarded visitation 120 days per year. Mother's attorney pointed out that Father's pre-trial memorandum stated, "[Father] agrees to pay guideline support based upon the current guidelines," which implied that he was not seeking custody of the children. The chancellor stated that the primary residential parent designation had been conceded, and instructed Father's attorney to limit his questioning to whether visitation would be appropriate. Again, Father stated that he would need time to buy a house so that he could exercise his visitation rights. The house Father shared with his mother and sister only had three bedrooms. Father stated he did not know how long it would take for him to buy a house. Father admitted that during the past two and a half years, he never called Mother to inquire about the children. Mother testified that in the past two and a half years, Father never asked to see the children either. She stated that in the past four years, Father had called less than five times and sent a couple of birthday cards to the children.

Father testified about the parties' bankruptcy proceedings, which lasted over five years. He stated that he paid $710 to the wage earner plan each month during the proceedings, until the parties were discharged from bankruptcy in May of 2004. Father stated that he paid several of the parties'

debts through the wage earner plan, such as medical bills and student loan bills. However, he stated that he did not pay any other household bills outside of his contribution to the wage earner plan.

The parties had few marital assets. They purchased a home in 1996 with a $500 down payment, and since then, they had paid $500 toward the mortgage each month. Mother and the children were living in the home, and both parties agreed that Mother should be awarded the marital home. Mother had been paying the mortgage by herself since June of 2004, but because her name was not listed on the mortgage or the deed, she was unable to communicate with the mortgagee about the terms of the mortgage. Mother estimated that the home was worth $55,000, and the mortgage was estimated at $50,000. Father's pre-trial memorandum proposed that he be awarded one-half of any equity in the marital home. However, Father presented no evidence of the value of the home, and he claimed that he was unaware of the amount of the mortgage balance. Father estimated the furnishings in both parties' households were worth a total of $1,000, and he proposed that Mother be awarded the furnishings in the marital home.

The parties also testified about the insurance check and the damage to the marital home. Mother testified there was a hole in the roof of the house, which allowed water to leak in and heat to escape. The parties' homeowner's insurer issued a check for $6,044.72 in May of 2004, which Mother testified was for repairing the roof and the resulting water damage. The check was apparently forwarded to Father through his attorney for Father's endorsement, and Father cashed the check and spent the money himself. Father testified he knew the money was to be used to repair the marital home. He testified about spending the $6,000 as follows:

> I was – I was caught up in a scam. Somebody called me at the house and they said I won two million. I sent off – I – they had to have it wired and they told me to send $3,000. I sent – I wired to Western Union $2,000. At first it was $1,517, and $1,333, and I wired it to them. Then it – I was scammed. And then also I gave $1,000, you know, to my church, and I spent $600 personally on me for clothes, and the rest of the money that was left, I lost.

Mother testified the marital home was never repaired because she could not afford to pay for the repairs herself. She also stated that the water damage had progressively worsened since 2004 when she originally filed the claim.

Father testified that he owned a thrift savings plan, which he described as a 401k, worth $20,000 at the time of trial. Father also had a pension from the national guard and/or Veteran's Administration that he owned prior to the marriage, but he did not testify as to its value. In his Rule 14 Memorandum, Father stated that Mother should be awarded "the amount of his pension that she is entitled to by law."

Mother purchased a car after the parties separated, and she estimated that it was worth $1,000 more than the amount she owed on it. Mother testified that she owed approximately $92,000 in student loans, but only $52,000 of that amount was incurred during the marriage. Mother claimed

that the loans she borrowed during the marriage were used as income for the parties. She also explained that she used the loans to support herself and the children after the parties separated, because Father did not pay any child support for nearly a year. In addition to the student loans, Mother owed $1,800 for a medical bill that was not covered by her insurance. She explained that she had been admitted to the hospital because of stress. Mother also owed $5,750 in attorney's fees. Mother proposed that each party be ordered to pay $26,000 toward the student loans incurred during the marriage, along with one-half of the medical bill, and she asked that Father be ordered to pay a portion of her attorney's fees.

Following a lunch recess, counsel for Father requested that the chancellor recuse himself and transfer the case to another division. He stated:

> I thought about this matter over the lunch period, and I think that it's inescapable to me that the specter of these DCS records is that DCS led this matter to be in trial and there are too many issues that should not have been brought before the Court. Based upon the fact that I think these matters were improperly brought before the Court, to my client's detriment, with all this inadmissible argument and testimony that's been heard by this Court to a certain extent, I would ask the Court to exercise recusal and transfer this case to another division.

Mother's attorney noted that it was Father who originally raised the issue of the rape allegations in his complaint for divorce, when he alleged Mother engaged in inappropriate marital conduct by reporting the allegations. The chancellor stated that although the issues of molestation had arisen, and the records that were subpoenaed should not have been received, he had already made clear that he would not base his decision on those issues or records. The chancellor explained that although jurors are not trained to disregard excluded evidence, "this Court as well as any other can consider the evidence and base a ruling on the evidence before the Court." The chancellor then denied the motion for recusal.

At the conclusion of the testimony, the chancellor instructed the attorneys to exchange the parties' 2006 W2 forms for the calculation of child support. Father's attorney requested that income be imputed to Mother based upon a finding of voluntary underemployment, but the chancellor denied the request, stating that he found no evidence of voluntary underemployment. A final order was entered on April 24, 2007, which declared the parties divorced based upon stipulated grounds. The attached permanent parenting plan designated Mother primary residential parent and Father alternate residential parent. Father was granted visitation with the children every other weekend, on certain holidays, and for one week during summer vacations, for a total of eighty days per year. Major decisions regarding the children were to be made jointly by the parties. Father was ordered to pay $678 per month in child support and maintain health insurance coverage for the children. Mother was awarded the marital home and responsible for paying the mortgage. She was ordered to refinance or sell the home within twelve months. Mother was awarded one-half of Father's thrift savings plan, and she was awarded an additional $6,000 from Father's half of the thrift savings plan as compensation for Father's dissipation of the insurance check. Mother was awarded one-half the

amount of Father's national guard pension that accrued during the marriage. Each party was awarded the vehicle and personal property in his or her possession. Father was ordered to pay $1,500 of Mother's attorney's fees. Each party was ordered to pay his or her own debts, meaning that Mother was solely responsible for all of her student loans and the medical bill, in addition to the mortgage and her car note. Mother was awarded $200 per month in alimony in futuro. Father filed a timely notice of appeal to this Court.

## II. ISSUES PRESENTED

On appeal, Father contends that the chancellor committed error by:

1. "disbarring" Father's attorney;
2. failing to recuse himself;
3. awarding alimony in futuro;
4. failing to allocate marital assets and debts equitably; and
5. failing to award Father more "custodial time" with the children.

Mother contends that the trial court's judgment should be affirmed, and that she should be awarded her attorney's fees for defending against Father's frivolous appeal. For the following reasons, we affirm the decision of the chancery court. In addition, we find that Mother should be awarded her attorney's fees on appeal.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2007); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Father's Representation at Trial

Father first contends that the chancellor erred by "disbarring" his second attorney, Mr. Terry Clayton. Father argues that the chancellor "did not have the authority or right to prevent Attorney Clayton from practicing law in his court." Father cites only one case in support of his argument, *Joiner v. Joiner*, No. E2005-01619-COA-R10-CV, 2005 WL 2805566 (Tenn. Ct. App. Oct. 27,

2005). In that case, a trial judge prohibited an attorney from representing clients in the Fourth Circuit Court of Tennessee because the attorney announced his intention to run against the judge in the next election. *Id.* at *3. The trial judge ordered any filings by the attorney in "any litigation whatsoever" to be disregarded. *Id.* at *1. In addition, the attorney was prohibited from practicing in the circuit court regardless of whether that trial judge was presiding over the case or not. *Id.* at *8. The Court of Appeals stated:

> Mr. Lee has been duly admitted to practice before the courts of this State. This includes the right to practice in Fourth Circuit Court. This right cannot be taken away from him absent his misconduct or failure to abide by applicable rules governing the practice of law. There is no evidence that he has been guilty of either. . . . While a judge with respect to his or her court has the "inherent power to control the exercise of the administration of justice," that power is not so expansive as to include disbarment of a potential and announced challenger for the judge's position from practicing in the court that the trial judge is currently occupying simply because of the challenger's announcement.

*Id.* at *9. *Joiner* is clearly distinguishable from the case at bar.

In this case, the chancellor refused to allow Mr. Terry Clayton to serve as "second chair" for Father because he was previously permitted to withdraw as counsel for Father, and he had not participated in the case for two years. Mr. Clayton did not provide notice to the chancellor or to opposing counsel that he intended to represent Father at trial. Mr. Floyd was entered as Father's counsel of record, and he was prepared to proceed with the trial. Mr. Clayton claimed that he filed a notice of appearance three days before trial, but the chancellor stated that it was not included in the case jacket or entered into the computer. We note that a notice of appearance is included in the record before us on appeal, but it bears an incorrect case number that is marked out, with the correct case number handwritten beneath it. It is clear from the chancellor's statements in the transcript that the notice of appearance was not included with the other documents filed in this case.

All courts possess inherent power to "maintain control over proceedings conducted before [them.]" *Joiner*, 2005 WL 2805566, at *4 (quoting Tenn. Sup. Ct. R. 9 § 1.2). Trial judges are responsible for controlling the conduct of the lawyers appearing before them. *In re Ellis*, 822 S.W.2d 602, 605 (Tenn. Ct. App. 1991). "Their authority is necessarily broad, and thus, their decisions concerning the conduct of their court's business are entitled to appellate deference." *Id.* It follows that we review decisions with regard to a lawyer's conduct in open court using an "abuse of discretion standard." *Id.* (citing *Norton v. Tallahassee Memorial Hosp.*, 700 F.2d 617, 619 (11th Cir. 1983); *Robinson v. Air Draulics Eng'g Co.*, 214 Tenn. 30, 37, 377 S.W.2d 908, 912 (1964)). Under the abuse of discretion standard, a trial court's ruling will be upheld so long as reasonable minds can disagree as to the propriety of the decision made. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)). A trial court abuses its discretion only when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the

party complaining. *Id.* (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). "The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Id.* (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). We conclude that the chancellor did not abuse his discretion by refusing to allow Mr. Clayton to participate in the trial.

### B.  Motion for Recusal

Next, Father argues that the chancellor should have recused himself because he reviewed records from DCS regarding the rape investigation. It is not clear from the record that the chancellor did in fact review the records. Some type of records were received by the chancellor on the day of trial, but apparently they were not records from DCS . A DCS representative was present before trial and stated:

> Your Honor, the State just received a subpoena. We are in the
> process of retrieving the records. We are going to move to quash the
> subpoena, of course. The court would have to order it and find that
> they are reasonably necessary to even bring this in for a review.

Mother's attorney stated she would "relieve the State of the need of preparing a Motion to Quash," and the documents were never produced. Although the trial court may have "received" some records from the child advocacy center on the morning of trial, the chancellor stated that he would not consider the child advocacy center records. The chancellor made clear that he would not admit any of the records into evidence or consider them in making his decision. Father's attorney did not object to the chancellor's resolution of the issue and proceeded with the trial. It was only after the bulk of the testimony had been presented that Father moved for the chancellor to recuse himself.[3] The chancellor denied the motion for recusal and explained, again, that he would only consider the evidence before the court in making his ruling. The chancellor also recognized Mother's argument that it was Father who originally raised the issue of the rape allegations in his complaint for divorce and his answer to Mother's counter-complaint. Father's pre-trial memorandum filed in 2005 contained a list of disputed issues, in which he denied being "indicated by the Tennessee Department of Human Services as a sexual abuser" and stated that "strict proof of all remaining allegations in this paragraph are requested at the time of trial."

We review a trial court's determination on a motion for recusal under an abuse of discretion standard. *In re C.T.S.*, 156 S.W.3d 18, 22 (Tenn. Ct. App. 2004) (citing *Caudill v. Foley*, 21 S.W.3d 203, 215 (Tenn. Ct. App. 1999)). "[W]hether recusal is warranted is left to the discretion of the trial judge, and such decision will not be reversed absent a clear abuse of discretion on the face of the

---

[3] Recusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality. *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). Courts frown upon the manipulation of the impartiality issue to gain procedural advantage and will not permit litigants to refrain from asserting grounds for disqualification in order to experiment with the court, and raise the objection later when the result of the trial is unfavorable. *Id.* (citing *Holmes v. Eason*, 76 Tenn. (8 Lea) 754, 757 (1882); *Gotwald v. Gotwald*, 768 S.W.2d 689, 694 (Tenn. Ct. App. 1988)).

record." ***Bd of Prof'l Responsibility of Sup. Ct. of Tenn. v. Slavin***, 145 S.W.3d 538, 546 (Tenn. 2004) (citing *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001)). "Parties challenging a judge's impartiality 'must come forward with some evidence that would prompt a reasonable, disinterested person to believe that the judge's impartiality might reasonably be questioned.'" ***In re C.T.S.***, 156 S.W.3d at 22 (citing *Davis v. Dep't of Employment Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999)). Father failed to meet this burden. His brief states, "it is clear that the trial judge had a personal bias or prejudice toward [Father] and his attorneys." As support for this statement, he recites various ways in which the trial court ruled in favor of Mother. However, an adverse ruling does not necessarily indicate bias or prejudice and is not grounds for recusal. ***State v. Reid***, 213 S.W.3d 792, 816 (Tenn. 2006); ***Davis v. Liberty Mut. Ins. Co.***, 38 S.W.3d 560, 565 (Tenn. 2001). "If the rule were otherwise, recusal would be required as a matter of course since trial courts necessarily rule against parties and witnesses in every case, and litigants could manipulate the impartiality issue for strategic advantage, which the courts frown upon." ***Davis***, 38 S.W.3d at 565. We find no support for Father's allegations of prejudice, and we find the chancellor did not abuse his discretion in denying the motion for recusal.

## C. Division of Property

On appeal, Father also contends that the trial court erred in failing to value each of the marital assets before allocating the property. However, Father admits that he did not present proof regarding the value of the assets. "The parties, not the court, are responsible for proposing values to marital property." ***Blevins v. Blevins***, No. M2002-02583-COA-R3-CV, 2003 WL 23094162, at *3 (Tenn. Ct. App. Dec. 30, 2003) (citing *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987)). "The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present." ***Koch v. Koch***, 874 S.W.2d 571, 577 (Tenn. Ct. App. 1993). Although the trial court should place a value on marital assets, its failure to do so does not necessarily constitute reversible error. *See, e.g.*, ***Cox v. Cox***, No. M2003-01622-COA-R3-CV, 2004 WL 1562516, at *6 (Tenn. Ct. App. May 5, 2004) ("While the trial court should value marital assets . . . we find this a proper circumstance for the application of the maxim *de minimis non curat lex* (the law does not concern itself with trifles)."); ***Adams v. Adams***, No. 02A01-9310-CH-00219, 1996 WL 111150, at *2 (Tenn. Ct. App. Mar. 12, 1996).

The only assets at issue were the marital home, Mother's car, Father's thrift savings plan, Father's national guard pension, and the furniture and personal property in each party's possession. Mother estimated that the parties owned $5,000 equity in the marital home and $1,000 equity in her car. Both of these assets, and the accompanying debts, were awarded to Mother. Father testified his thrift savings plan was worth $20,000. The trial court awarded one-half the balance of the plan to Mother. The court also ordered Father to pay $6,000 to Mother from his share of the plan to replace the insurance check he dissipated during the divorce proceedings. Mother was awarded one-half the amount of the national guard pension that accrued during the marriage. The parties agreed that each would keep the personal property and furniture in his or her possession. Mother testified she incurred $52,000 in student loans during the marriage, and an $1,800 medical bill.

Father presents a perplexing argument regarding the division of marital debt. Father's brief states:

> The trial court, did not adjudge the liability for the Wife's debt to either party, but by implication he held that the debt was marital and not separate debt. The trial court's award of marital debt to the Husband was not properly supported by the evidence and should be reversed on appeal.

From our review of the record, it appears that no marital debt was allocated to Father. In the final decree of divorce, the trial court ordered each party to "pay his or her own debts outstanding at the time of the divorce." There was no evidence of any debts owed by Father. Mother was specifically ordered to pay the mortgage on the marital home, and she also owed a total of $92,000 in student loans and $1,800 for the medical bill. Some of these debts were clearly marital debts, as they were incurred during the course of the marriage. *See Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). However, the chancellor specifically stated when announcing his ruling, "I'm not requiring [Father] to pay the marital debt, the $52,000." Father was not ordered to pay any portion of the marital debt, and his argument on this issue is without merit.

Father alleges that the trial court's overall division of marital property was inconsistent with the factors in Tennessee Code Annotated section 36-4-121(c) and not supported by a preponderance of the evidence. However, Father does not specify how any the statutory factors weigh in his favor, or how the trial court's distribution of the estate was inequitable.

Appellate courts give great weight to the decisions of the trial court in dividing marital assets, and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). "The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Id.* Dividing the marital assets is not a mechanical process and trial courts are afforded considerable discretion. *Id.* (citing *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001)). We find no merit in Father's arguments, and we affirm the trial court's distribution of the marital estate.

### D.   Alimony

Father contends that the trial court erred in awarding Mother $200 per month in alimony in futuro. He argues that Mother has a greater earning capacity than Father, and that she is voluntarily underemployed because she did not become a licensed social worker or a full-time school teacher.

The trial court has broad discretion in determining the type, amount, and duration of alimony based upon the unique facts of each case. *Sullivan v. Sullivan*, 107 S.W.3d 507, 511 (Tenn. Ct. App. 2002) (citing *Kinard v. Kinard,* 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). "This Court is

-12-

not inclined to alter a trial court's award of alimony absent a finding of an abuse of discretion." *Id.* (citing *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001)). If the trial court's decision is within a range of acceptable alternatives, appellate courts will not substitute their decision for that of the trial court simply because the appellate court would have chosen a different alternative. *Id.*

The two most relevant factors in determining the amount of alimony awarded are the economically disadvantaged spouse's need and the obligor spouse's ability to pay. *Broadbent v. Broadbent*, 211 S.W.3d 216, 222 (Tenn. 2006). Tennessee Code Annotated section 36-5-121(i) lists several factors for consideration when determining the nature, amount, and length of term of alimony.[4] Our general assembly has expressed a preference for rehabilitative alimony when the economically disadvantaged spouse can achieve, with reasonable effort, an earning capacity that will permit a standard of living after the divorce comparable to the standard of living the parties enjoyed during the marriage, or to the post-divorce standard of living available to the other spouse. Tenn. Code Ann. § 36-5-121(d)(2) (2005). If rehabilitation is not feasible, meaning the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity to permit a reasonably comparable standard of living, the trial court may award alimony in futuro. Tenn. Code Ann. § 36-5-121(f)(1) (2005).

Father did not file a pre-trial memorandum containing information about his income and expenses.[5] Father testified that in 2006, he earned $28,333 working at the Veteran's Administration

---

[4] These factors include:
(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.
Tenn. Code Ann. § 36-5-121(i) (2005).

[5] Father did attach an "income and expense statement" to his response to Mother's petition for contempt in 2004, which stated that Father lived with his mother and sister and paid $200 per month toward the rent, taxes, and
(continued...)

Medical Center. He also testified that he lived with his mother. Mother earned between $11,000 and $13,000. Although Mother received a bachelor's degree in social work in 2003, she testified that without a license, she could only earn approximately seven dollars an hour. Mother testified she did not have "enough background" to become a licensed social worker. Mother also testified that she had applied for numerous other jobs, but she had not been hired. Mother was currently substitute teaching, and she could not become a full-time teacher because she had not been able to pass the required tests. Father testified that Mother had prior work experience as a daycare worker, and she had worked at Walgreen's. At the conclusion of the trial, Father requested that the trial court impute income to Mother because she was voluntarily underemployed. The chancellor stated that he saw no indication or proof that Mother was underemployed, as Mother had made attempts to obtain better employment.

When determining the appropriate nature, amount, and length of an alimony award, we must also consider other factors beyond the parties' education and earning capacity. The parties were married for fourteen years. The divorce was granted based on stipulated grounds. Both parties were fifty years old at the time of trial and in good physical health. It appears from the record that both parties enjoy good mental health, although Mother was recently hospitalized because of stress. Mother was granted primary custody of the parties' two minor children. Father's separate property consisted of the portion of his national guard pension that accrued prior to the marriage. Mother did not own any separate assets, but she owed approximately $40,000 in separate debts. Mother was also ordered to pay the $52,000 in student loans and the $1,800 medical bill in the division of marital property, and Father was not ordered to pay any of the marital debt.

Considering Mother's need and Father's ability to pay, along with all the other relevant factors, we find no abuse of discretion in the trial court's award to Mother of $200 per month in alimony in futuro.

### E.    The Parenting Plan

Finally, Father argues that he is entitled to more "custodial time" with the children, and that he never conceded that Mother should be named primary residential parent. Father sought custody in his complaint for divorce, but in Father's answer to Mother's counter-complaint, he stated that he "would like to have some kind of visitation with his children." In his pre-trial memorandum, he agreed to continue paying child support according to the current guidelines. When Mother's attorney gave her opening statements, she stated the parties agreed that Mother would be designated primary residential parent, and Father's attorney did not dispute her statement. When the chancellor asked Father's attorney to clarify whether Father was seeking "custody" or "visitation," he stated that

---

[5](...continued)
insurance. Father still lived with his mother at the time of trial in 2007, but there was no testimony about his current expenses. The 2004 document listed approximately $300 in monthly expenses for food, clothing, medical/dental costs, laundry, and the barber shop.

-14-

Father was seeking "custody 120 days out of the year" as "the ARP," or alternate residential parent.

In any event, we cannot say that the trial court erred in naming Mother primary residential parent and granting Father visitation eighty days per year. Father testified he did not call or attempt to see his children for at least the past two and one-half years, and he testified he was not presently prepared to have visitation with the children because he needed to buy a house. Appellate courts are reluctant to second-guess a trial court's custody decision where so much depends on the trial court's assessment of the witnesses' credibility. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Steen v. Steen*, 61 S.W.3d 324, 328 (Tenn. Ct. App. 2001). Custody decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings. *Marlow v. Parkinson*, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007) (citing *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). As such, trial courts have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. *Id.* "It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). If no error in the trial court's ruling is evident from the record, the ruling must stand. *Id.* In sum, a trial court's decision regarding custody should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). We find no error in the trial court's award of custody and visitation.

### F. Attorney's fees on Appeal

Mother has requested an award of attorney's fees on appeal pursuant to Tennessee Code Annotated section 27-1-122, claiming that Father's appeal is frivolous. The argument in Father's first appellate brief did not contain citations to the record. After Mother's brief pointed out this deficiency and alleged that Father's appeal was frivolous, Father filed an amended brief containing proper citations. Mother then filed an amended brief in response. The decision to award damages for the filing of a frivolous appeal rests solely in the discretion of this Court. *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006) (citing *Banks v. St. Francis Hosp.*, 697 S.W.2d 340, 343 (Tenn. 1985)). "Successful litigants should not have to bear the expense and vexation of groundless appeals." *Id.* (quoting *Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977)). An appeal is frivolous when it has "no reasonable chance of success," or is "so utterly devoid of merit as to justify the imposition of a penalty." *Id.* (citing *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978); *Jackson v. Aldridge*, 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999)). We exercise our discretion under this statute sparingly so as not to discourage legitimate appeals. *Id.* However, after reviewing the record and Father's arguments on appeal, we find his appeal is devoid of merit and had no reasonable chance of success. Mother should not be forced to bear the expense of defending against Father's groundless appeal. We remand the case for the trial court to assess appropriate damages as set forth in Tennessee Code Annotated section 27-1-122.

### V. CONCLUSION

-15-

For the aforementioned reasons, we affirm the decision of the chancery court and remand for further proceedings. Costs of this appeal are taxed to the appellant, Rickie B. Clayton, and his surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.